Messenger? Yes, sir. You may proceed. Good morning, your honor. Good morning. And may it please the court. The plaintiff appellants in this case are licensed family child care providers, which means that they operate child care businesses within their own homes, and they challenge the constitutionality of a statute that calls for certifying an exclusive representative of providers that will be vested with the, quote, right to represent family child care providers in their relations with the state, unquote. They challenge the statute is unconstitutional because it compels association for the very purpose of petitioning the government for redress of grievances under the First Amendment. The first question before the court is whether their claim is ripe, and the key to determining that question is when will this statute first compel association? When the state forces these providers to associate with AFSCME as their exclusive representative, or only later when the state forces them to pay compulsory fees to AFSCME, as the district court assumed in its decision. I submit that it's the former exclusive representation. Is the first step a petition? Is the first step to get organized a petition, right? Yes. Has there been a petition yet? No. AFSCME has indicated they're moving towards filing a petition, but they have not yet requested an election under the act. If there hasn't even been a petition yet, tell me, and of course I know we're waiting on Harris versus Quinn, but tell me the difference between this and the Harris versus Quinn case. The distinction in Harris only challenges the constitutionality of compulsory fees. So the Seventh Circuit in Harris, and now the Supreme Court, is looking at whether or not the imposition of compulsory fees is imminent, at a point during which the providers have not yet been unionized. SCOTUSblog says the second issue is a ripeness issue. Did I read SCOTUSblog wrong? No, it is a ripeness issue, Your Honor, but the distinction between the situations is, is the possibility of compulsory fees imminent enough for the case to be ripe in Harris? Well, they've already had an election in that case. In which the union lost. Yeah, the union lost, but they've already had an election. So the harm in Harris is further away. So in Harris, you have the unions lost the election, and the question is how far away is the possibility of compulsory fees, which would take several steps. First, the union would have to request another election, then win it, and then negotiate an agreement that required fees. Here, the harm is... That sounds like this case. Help me, help me. Well, no, because here the Parrish et al. challenge exclusive representation. That the union being certified as their exclusive representative, and not only the compulsory fees. You have to have the petition first, right? Yes. And there's not representation at the petition stage. That's just... That's correct. Signatures. And second, you have to have an election then, right? The election, yes. Right. And that hadn't happened. Well, the election... So you may never be represented, right? Yes, that's correct. However, it's basically one step, because once the petition is filed, there will be an election. There will be a mail ballot election, and then that election will be over in approximately a month. And the conclusion of that election will determine whether or not they're exclusively represented. But if they vote no, they won't be. That's correct. So there is one contingency or two. Will a petition be filed? Which, again, Ask Me has said in itself, it's moving towards filing a petition. And then the second is, will they win that election? And so the question before the court can be framed as, what better time is there than now? Should the court determine now before... After an election and a petition. Go ahead. Yes. Or in the alternative, does the court want to wait until the petition is filed? Or have the district court, I should say, wait until the petition is filed. In that case, it would require adjudicating the legal issues presented in the preliminary injunction during the crucible of an election. So all these issues would have to be adjudicated in a 20 or 30 day span while the election is ongoing. While the plaintiffs in this case are trying to fight unionization, while Ask Me is expending resources, trying to unionize them, and while the state is busy trying to run the election. I submit it makes more sense for the court to determine now, before an election is called, whether or not it would be constitutional to unionize them. And in fact, the election itself constitutes a harm to them. Because the entire purpose of the First Amendment, of course, is to protect individual rights from the tyranny of the majority. And for the state to put... You're assuming they're going to lose. Tyranny of the majority. You may be the tyrannical majority. Well, no. If they lose, it means each individual is free to choose for themselves whether or not they want to associate with Ask Me, which is the status quo for almost every other organization, is that each individual chooses. Whether they wish to associate with the organization or not. It's only the state imposing exclusive representation that imposes the tyranny of the majority. That the majority vote in that election will decide for all providers whether or not they must accept Ask Me as their exclusive representative. And that in and of itself, putting them through that, their rights through that crucible is wrongful. I mean, for example, if the state said, let's put to a majority vote what church everyone should belong to. I don't believe the court would say, let's wait until the vote happens and then determine afterwards if it's constitutional. Some states, they do wait until after the election. California adopted many, many years ago a provision that the Supreme Court later declared unconstitutional. But they adopted a provision that essentially reversed Brown versus Board of Education. And they let the people vote on it. Now, some states don't do that. You're correct. Some states cut it off at the pass. But within a ballot initiative, it's not even law yet. So you couldn't even sue. There's almost what can you enjoin? It's that's they let them go ahead. But here, of course, you have any questions? Go ahead. But here, of course, you have a statute that calls for designating an exclusive representative for providers based upon a majority vote. That's the sole purpose of the statute being challenged here. And so I submit that the court should decide now, would it be constitutional for the state to certify a majority upon a majority vote before that vote occurs instead of letting them fight through that vote? And then also, even if the providers do win and do hold off AFSCME, there's a possibility that AFSCME could try again and try again. And so until at least the law expires in 2017, this sort of Damocles will be hanging over their heads. I submit their constitutional rights should be adjudicated now. And I believe there's two cases that support the plaintiff's position in this case. And that's Babbitt versus United Farm Workers, which is a Supreme Court case, and Mulhall versus Unite here, which is in the 11th Circuit. Both cases are cited in the brief and discussed. In Babbitt, a union challenged the constitutionality of state election law procedures. The union in that case had never invoked those election law procedures. And yet the Supreme Court held that the challenge to that statute, they could challenge that statute, even though they'd yet to invoke those election procedures. The same result here, except for, of course, instead of looking to impose exclusive representation, the providers are looking to fight it off. And in the second case is Mulhall versus Unite here, which is out of the 11th Circuit. There, an employee challenged a contract or an agreement that would facilitate his unionization. He had yet to be unionized. And in fact, he could never be forced to pay compulsory fees to the union because Florida's a right-to-work state. And the 11th Circuit held that his challenge to that agreement was ripe because it created a risk that he would be unionized. And that unionization does create a harm because exclusive representation creates a fiduciary relationship between the individual, in this case employee, here would be a provider, and the union. What difference does it make that Minnesota's not a right-to-work state? In this case, compulsory fees are even possible after the imposition of exclusive representation. Here, or I'm sorry, in Florida, it wasn't. So it goes to the point that exclusive representation alone is a harm, and not only compulsory fees, as the district court assumed. Because the assumption underlying the district court's opinion is that the provider's rights won't be infringed upon unless and until they're forced to pay compulsory fees. Which, again, that'd be three steps away. But I submit it's exclusive representation. Once that election is over, and if the Commissioner of Bureau of Mediation Services says, yes, AFSCME is now your exclusive representative, that is an injury because at that point, Jennifer Parrish and the other providers will be thrust into a mandatory fiduciary relationship with AFSCME, in which the union is granted, quote, the right to represent family child care providers in their relations with the state, which would effectively be a compulsory lobbyist. The union would have the right to petition the government and enter into contracts on behalf of Jennifer Parrish and Pat Gents and the other providers. Have they done this with other people like CPAs or architects or anybody like that? Not vis-a-vis the state. The only two compulsory associations that I can think of are unions with respect to true public employees, which would not, of course, include these child care businesses, and then bar associations also have mandatory. Those are the only two compulsory associations that I'm aware of. And both of which, under current Supreme Court law, are held to be justified by compelling government interests. Which providers submit here are absent, that the state does not have a compelling interest for forcing the providers to accept AFSCME as a representative for petitioning the state over a child care public aid program, which is called C-CAP, or C-CAP, rather. And so here, that absence of compelling state interest is what distinguishes the unionization of home child care providers from the unionization of public employees and from bar associations. And it's for that reason that I believe that the law should be preliminarily enjoined, and then ultimately held unconstitutional, because the plaintiffs have shown a substantial likelihood of success on the merits. Because the state and the union have not demonstrated that they have a compelling government interest, which is required under Knox, to force these individuals to accept AFSCME as their exclusive representative for petitioning the state. Now, one of the cases that the union relies heavily on, and also the state, is Minnesota versus Knight. And I would just like to discuss that case for a moment. Minnesota versus Knight does not involve a claim of compelled association. In fact, the court so holds in footnotes 11 and 13. Instead, there, the plaintiffs complained of being excluded from bargaining sessions. And the Supreme Court held it was constitutional for the state of Minnesota to exclude individual employees from union bargaining sessions. Because the state has the right to choose to whom it listens. Individuals may have the right to speak, but the government can choose whom it listens to. Here, however, the statute is not so limited to just choosing who the state will listen to. The statute also calls for designating an exclusive representative, again, for the provider. So here, the state is choosing who shall speak for Jennifer Parrish and Pat Gents and the other- Well, they have a provisional law that says anybody can petition, and goodness gracious, the representatives and senators in Minnesota will be out, and these people are, some of these are modern popper outfits, right? Yes. They're going to be knocking on doors, and there's going to be petition at the door. Yes. And how. So tell me why that doesn't save it, both the practical level and the law having the exception level. Because I submit it's not exculpatory, because if compelled association is a violation of First Amendment rights, the fact that the providers may have other First Amendment rights left, like they're not restricted, doesn't justify the compelled association. For example, a good example would be the Supreme Court's decision in Hurley. And in that case, they held it unconstitutional to force a parade to include certain marchers. Now, it's very true that parade could choose any other marchers. It had a lot of First Amendment associational rights left, but it was still unconstitutional to compel that association. So the fact that, for example, Jennifer Parrish can still petition the state individually, doesn't justify forcing her to associate with Ask Me for that same purpose. So, yes, I submit their residual ability doesn't save it. And to go back to Minnesota versus Knight, I think an example can show why that decision is distinguishable. If here the statute only said that the governor shall negotiate with Ask Me over child care rates, that in and of itself would not violate anyone's constitutional rights. The governor can choose to whom he listens. But here, of course, the statute goes beyond that. It calls for, pursuant to an election, certifying exclusive representative to speak for these individual providers. And it is that fiduciary relationship, which the Supreme Court has analogized to that between an attorney and a client, or a trustee and a beneficiary, that compels association. And the fact that the state can choose to whom it listens doesn't give it the right to choose who shall speak for individual providers who simply do not want to associate with Ask Me. And I see that I only have about a minute and a half left before I was going to reserve five minutes for rebuttal. So I don't want to begin something that I won't be able to finish. So unless this court has any other questions, I'll reserve the remainder of my time. You may, thank you. Thank you, Your Honor. Mr. Gilbert? Yes. You may proceed. Good morning, sir. Good morning. May it please the court, my name is Alan Gilbert. I'm a member of the Minnesota Attorney General's Office, and I represent appellees Dayton, Jessen, and Tilson in this matter. I'd like to talk about the justiciability issue first. And as the court is well aware, the Supreme Court has repeatedly stated that there is no principle that is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal court jurisdiction to actual cases or controversies. And this was most recently reiterated by the United States Supreme Court in the Clapper case just last year. And Clapper also said that this scrutiny in terms of Article III is especially rigorous. That's the language of the Clapper court. When an action of one of the other two branches of government are being challenged as unconstitutional. They mean federal when they said one of the other? Yes, they were referring to federal at the time because it was a federal challenge. Even more on point is Harris versus Quinn. Absolutely, Your Honor. I just go to this blog, it sounds like we may well have guidance from that that just controls this case. Your Honor, I think that is right. Okay, tell me the, I asked the other side, tell me the relevant similarities or differences in Harris versus Quinn and this case. And let me just make sure that everyone's aware that in Harris versus Quinn there was actually two groups of employees involved there. One group, there was an election where the union prevailed. And as a result, Harris versus Quinn will definitely get to the merits of the case because of that group. The rightness issue was raised as to the other group where the union was not successful. So necessarily the court is going to get to that issue. But I have to tell you that the briefing on the issue was almost non-existent. So it's obviously a secondary issue. It wasn't even raised at the argument before the Supreme Court. It isn't a certified question to Supreme Court, though. It is. The Supreme Court identified it as an issue, so it will be ruled upon. I don't think there's any doubt. But in terms of Harris versus Quinn, counsel suggests that Harris versus Quinn from the Seventh Circuit, or at least the Seventh Circuit decision on review at the Supreme Court, that it was based solely on this notion of compulsory fees. Well, that's just not true. The opinion in that case mentioned compulsory fees. But the statute in that case or the action was challenged on the association grounds, the identical association grounds that plaintiffs are asserting here. But even more to the point, the harm that was the basis for rightness in that particular case is identical to the harm that's being asserted here. And that is having to somehow oppose an election, even though it's speculative whether an election would even occur. And of course, the reason why it's speculative, why an election may not occur, is precisely the analysis of the district court in this case. And we have it set forth in our brief in some detail, but I think it's important to emphasize what the statute provides for. The statute provides for, literally, a series of contingencies. Initially, the union must submit a petition to the Bureau of Mediation Services in Minnesota with 500 names of family child care providers to support the petition. How many are there? Does the record reflect how many there are? It does not, but it's many thousands. You should know how many there are. They're licensed. Yeah, they are. There's about 10,000 in the estimate. Yeah. On that point, what's the quick background of the legislative history in this, in terms of did this spring from the mind of just one legislator? Your Honor, I... In other words, the point is, doesn't it beggar your credulity to say that this legislative scheme  There's going to be an election. You know it, and I know it. Your Honor, maybe, maybe not. It depends. Let me get to the list of contingencies here. Under what circumstances would there not be an election? Well, let me go to the next contingency. After the 500 names are submitted, which it has not been, and none of these contingencies have been satisfied, at that point in time, the eligible provider, I'm sorry, the union, would get a list of all DHS employees who are eligible to vote. And after that, then... Employees, you mean contractors. Help me with what... Yes, yes. It would be the providers... You're not calling them employees, are you? Your Honor, I... Again, they are not strictly employees. Yeah, right. That is a misstatement. That is... They're deemed to be employees under the statute for purpose of the negotiations. Goodness gracious. Proceed. Yeah. But after that, then, once they get the list, they need to go through the list, and presumably, they'll be talking to different providers about whether they support them. If they can get 30% of those providers from the list of the eligible providers, then they can file a petition with the Bureau of Mediation Services. And if a petition is... And I should mention that under the terms of the statute, if that petition with 30% support is not filed by June 30th, 2017, about two years from now, the statute expires. So there's no authorization at that point in time. The legislature could extend that time, right? They could, but again, that's another speculative contingency, Your Honor. And then the... Assuming the 30% is done before June 30th, 2017, then the BMS commissioner, the Bureau of Mediation Services commissioner, holds a secret election, and the union has to get a majority of the votes to be certified. I note as well that even if the union is certified and therefore negotiates with the state on behalf of the providers, by statute, the state is not obligated to agree to anything or to any concession whatsoever. So we can confer statute, counsel? Effectively, it is, because you don't have to. And then if an agreement is reached, the legislature must then decide whether to approve the agreement. And if the legislature approves, then the union needs to decide whether to approve it. But we don't even know what the negotiations are going to entail. The negotiations would focus on the subsidy, there's no question about that. And it might well be that that subsidy, the decisions and negotiations, are going to result in a benefit to the providers, to all providers. So not only don't we have a petition with the 30%, not only don't we have an election, not only don't we have a negotiation, we've got nothing. It's entirely speculative, and the district court recognized that. Now, counsel says here, and says in his brief, that Judge Davis only relied on the notion that there may or may not be a compulsory fee at the end of all of this. Well, that's not true either. If you look on page 19 of the court's order, it says, he goes through all of these contingencies, including that the court cannot predict whether an election under the act and subsequently whether an exclusive representative is likely to be certified. So he did precisely what he's supposed to do under the law. And that's what he said, and it's not limited to the compulsory fee. We cited to a number of cases from the Eighth Circuit and the Supreme Court that support this notion. The public water supply case, which ironically dealt with a petition that wasn't filed. The orchard case, which dealt with- Counsel, I've lost interest in your argument. You're so far over time, but have her, Judge Wilman, let her- Well, it's fine by the other judge. You've used your seven minutes. I did, I did. I will appreciate it. You'll have to make your peace with your colleague. I will. Thank you very much. And you are Mr. West. Yes, John West, representing- You have only 12 minutes. Okay, I'll try and- Go on. Do that. My assignment was principally to discuss the merits of the case, but before I get to that, let me just say two words to supplement what Mr. Gilbert said. First of all, the counsel's argument this morning as to why this case is ripe, sounds to me more like saying, well, it's not ripe, but you should decide it even though it's not ripe. They're asking essentially for an advisory opinion because there's no better time than now to- Well, I was going to ask your colleague, I'm thinking about this Texas case. Yes. If I paraphrase that, are you in effect arguing that whether or not an election will be held involves too remote and abstract an inquiry for the proper exercise of the judicial function? I mean, I don't see what's remote and contingent about it at all. Well, that's the argument your colleague made. It's entirely, the point of the Texas case, which has been quoted probably five, six, seven times by this court, is that if it is not certain that the alleged injury is going to occur, that the case is not right. Oh, so certain, does that have to be like you drop a book, it's going to fall to the ground, a certainty of gravity? I mean, but certainly impending is the term that they use. Here, your honor, here there are two things that have to happen. First of all, a petition has to be filed that shows with sign cards that at least 30%, so that's going to be 3,000 or more. Doesn't it strain credulity, I said beggar credulity, doesn't it strain credulity to think that the petition will not be circulated? Certainly a petition will be circulated, but that doesn't mean that the union will be able to get the necessary signatures. And even if they do, it certainly doesn't mean that the union, to a certainty, will win the election. In our brief, we cited some data from the National Labor Relations Board, shows unions, even looking only at elections in which a petition has actually been filed, the union succeeded in getting an election. Even in those cases, it's only something like two-thirds or less of the cases that the union actually wins. So the union is certainly attempting to win this election. We hope it will win the election. I wish it were certain that it would, your honor, but I'm afraid it's not. The Babbitt case, which counsel mentioned, the challenge there was to certain election procedures, how the election was conducted. And the allegation was that it was futile for the union to ask for an election because of the nature of the procedures. What you have here is not election procedures. What you have here is a contingency which will happen only if an election is held and the union wins the election. It's not at all the same case as you have in Babbitt. I would commend to you, I think the city of Peculiar versus the water district, which we discussed at some length in our brief, is exactly on point. The court says, even if the city is working towards getting the water district disestablished, the ultimate decision of that depends on the action of the electorate. And the same is exactly true here, and for that reason, it's- Do you want to address my question about how similar or dissimilar this case is from Harris versus Quinn? Well, with respect particularly to the, I mean, it's on the merits. It's dissimilar in that Harris is an agency fee case. It addresses the issue, and this issue came up at oral argument. Mr. Messenger was asked, is the issue of exclusive representation per se, putting aside agency fees, is the issue of exclusive representation at issue here? And Mr. Messenger correctly said, no, it's not. It's an agency fee case. It's a question of compelled support. That issue is not present in this case. And it's, even though counsel has talked about it a lot in his briefs, and the reason it's not present is because this is a facial challenge to the act. The entire act, everything in the act, could be implemented without an agency fee ever being charged. And because it's a facial challenge, the plaintiff has to exclude the possibility that it has to establish there's no set of circumstances under which the act could be constitutionally applied. So the issue before the court is only the issue of exclusive representation, not the question of whether agency fees, so it's different from Harris in that regard. And whatever Harris says certainly may well shed some light on the issue before you. But it's going to address the question of whether an agency fee is permissible. First of all, whether the court should overrule its longstanding precedent in Abood versus Detroit Board of Education. And secondly, whether that precedent applies to home care workers. Let me say one more thing on that issue. The home care workers in Harris are not identical to the child care workers here. In Harris, the argument at least, Mr. Messenger disputes this, but the argument is that they are public employees, that there's a joint employment relationship. That's what the Seventh Circuit said. That's the basis on which the case was argued. The court may well say agency fees are permissible for people like this. That is not necessarily going to resolve the case. And I'll talk in a moment about the nature of the people that we have here, who are independent contractors, we're not arguing that they're employees. But whatever the court says about the permissibility of an agency fee in Harris is not necessarily going to apply to the permissibility of exclusive representation. Compare this to a bar association. And there the United States Supreme Court says there's a compelling reason. We're going to carve out part of the dues, but there's a compelling reason to force a representative. Well, Your Honor- Compare it to that, how does this, where's the compelling reason? There is, there may well be a compelling reason, but that's not the standard, Your Honor, and I'll tell you why. The Supreme Court, in a whole line of cases, has made a fundamental distinction with regard to the extent to which the government can limit First Amendment rights of free expression and association. And it's distinguished between government when it's acting in its capacity as sovereign, regulating the citizens in general, and when government is acting as a proprietor of a government program that it's implementing. In the former case, strict scrutiny may well be required, at least if there is a mandatory association, which we would take issue with that here too, but I'll leave that to the briefs. But in the context of managing and implementing its own programs, the Supreme Court has said that the government has far broader powers with respect to restricting First Amendment expression than it does in regulating citizens in general. And that the deference is due to the government's reasonable assessments of its interest. I'm citing from the Umber case, which is cited in the briefs. And the key point here- What does Umber mean? If Umber applies, then the governor can't discriminate based on politics among these providers, right? I suppose- Umber says you can't discriminate among contractors to government on the basis of whether they're Republican or Democrat or who they supported, right? That's the holding of Umber. Well, it says that you can't terminate a contractor for his criticism of the government. Right. So that will apply here, won't it? But if you do, the same test, and here's the thing with Umber. It says that the deference to the government's determination of what's in its interests as a proprietor is not limited to the employment relationship. But it extends to independent contractors, as in Umber. And the NASA versus Nelson case, Justice Alito's opinion in that one, I think also supports that point that's cited in our briefs. Suppose these groups split into Republican, Democrat, or conservative, liberal, or something like that. The governor's going to have to be very careful about who the governor deals with if Umber applies the way you want it to apply. I'm not sure I'm following you, Your Honor, but- You're aware of the holding of Umber. Yeah, but the holding of Umber is, number one, that this guy has rights under the First Amendment. The court did not- the dissent, Justice Scalia wanted to say the government can terminate him regardless of anything. Politics, regardless of his politics. Yeah, the majority said, no, they can't, he has First Amendment rights. But, and here's the point where it's relevant to our case, in assessing whether he's been improperly terminated under the First Amendment, you apply the same kind of deferential standard as you do with regard to government employees. That's the part of the holding that's relevant here. You may get the whole thing and not just half the banana on Umber, but proceed. Okay. That's an awfully long way down the road. Go ahead. Yeah. Well, as you say in your brief, the state is permissible on the matter of compulsory representation. It's permissibly exercised discretion to determine what persons or groups it will listen to. So what's left to the parishes of the world? Well, I think that's right. I mean, that's the Knight case. That's exactly what Knight holds, and contrary to what Mr. Messenger said, footnotes 11 and 13, he has made this point throughout that that distinguishes the Knight case. What footnotes 11 and 13 simply say is that the issue of compelled fees, compelled financial support through the union for agency fees were not at issue in that case. That's all they say, and that is exactly the same situation we have here. So Knight is directly on point, holds that the state has in no way restrained appellees' freedom to associate or not associate with whom they please, including the exclusive representative. And your honors, I'm unaware of any court in any context that has ever held, putting aside agency fees, but in the context simply of whether exclusive, collective bargaining through an exclusive representative is permissible, I'm unaware of any court that has ever held that that is prohibited by the First Amendment. And Knight certainly holds exactly- Unless you did it on a prohibited basis, counsel. I'm sorry? Unless you did it on a prohibited basis. Governor's only going to deal with Democrats. Huh? Well, but what the government is saying, what the state is saying here is that we will recognize a representative that is selected by majority vote. So there's no, I don't, I don't, I'm sorry, your honor, I don't see the discrimination there. It's a determination by majority vote of the providers, whether they want a representative, and if so, who it will be. Thank you, your honors. Very well. You may proceed with your rebuttal, yes. Thank you, your honor. May it please the court. I'd just like to make three points. And begin with the phrase, certainly impending. A lot has been made of that phrase. And counsel just represented certainly impending means, I believe he said, certain to occur. That's not what it means. Certainly impending means that it's certainly possible, or definitely possible, not certain to occur. So for example, if I said it's certainly a possibility, it doesn't mean it's certainly going to happen, it means it's a possibility. Certainly impending means it's definitely impending. And proof of this can be found in the Babbitt decision on page 298 of that decision, where the court uses the phrase certainly impending synonymously with the phrase realistic danger. And there the court said that a plaintiff challenging a statute must show a realistic danger of being affected by it. An injury. Of an injury, yes. Right, for sure. And then the next line says that plaintiffs not have to wait for the consummation of injury, but it's enough if the injury is certainly impending. So by certainly impending, the court means realistic danger, not that it's automatically guaranteed to occur. If that were the case, injunctive relief would be very, very rare in cases where the harm has not yet occurred. And also the proposition in Babbitt that the plaintiff does not have to wait until they're injured has a great importance here. Under plaintiff's theory of the case, again, exclusive representation is the first injury. That will occur the moment the election is certified as a win for AFSCME. So plaintiffs are entitled to have their case heard before that happens. And so the question is, when is the best time to hear this action before that time? Well, counsel, we've not mentioned the Orchard Corporation case. Yes. Of this court. Isn't that a killer to you, especially footnote one? Not at all, your honor. In Orchard- Not at all. I'm sorry. Orchard involves a very peculiar process by which one has to appeal election decisions under the National Labor Relations Act, and it's a statutory case. Under the NLRA, the National Labor Relations Act, it doesn't provide any procedures for appealing from an election decision. So the only way you can appeal from an election is to wait, not bargain with the union, wait for the general counsel of the NLRB to file an unfair labor practice complaint for not bargaining with the union as a result of the election, and then bring that up the food chain to the court of appeals. So Orchard deals with the unusual statutory process prescribed by the National Labor Relations Act. It's not an Article III- You don't mean unusual in labor relations. You must mean unusual compared to other things, right? Because it's the way labor relations are done, right? Mandatorily, compulsorily. Yes, but just in terms of the way you have to appeal election decisions under, for whatever reason Congress didn't allow you to appeal directly from an election, you have to wait for the unfair labor practice procedures. And then also in the same cases that the state raises is the Water District case, which is City of Peculiar, I believe that was mentioned. That case is distinguishable because before there is an election, a state court must determine if holding that election is in the public interest. So there to get more specific- Isn't that a pro forma determination counsel under Missouri law? It probably usually happens, but there is a gap there where there would be a chance to adjudicate whether it was possible to hold the election before it was happened. So there, if one-fifth of voters want to dissolve a water district, it goes to the court before there's an election. So at that point, a plaintiff could bring a lawsuit, such as the city saying, or the water district there. That was wrongful. Here, you don't have that stop gap. If asked to file a petition tomorrow, the election machinery will start to run. There isn't a stop gap there in which the court would have time to adjudicate the issues in this case. And I think that really goes back to the original point of, if not now, then when? And really I think the question before this court is, does the court,  or now before an election petition is filed? Because once the election happens and is over, there'll be a certification right at the end. So Ms. Parrish can't wait until the election is over to bring her case, because by then she may already be harmed. And she's entitled to have her case heard before she is harmed. And I submit it be in the issue of judicial economy to decide this issue now, when there's plenty of time, rather than during the crucible of an election. In the city of Peculiar, there was that time because of the way it was set up. And then briefly I'd like to touch on the issue of a compelling government interest. AFSCME's counsel represented that the state doesn't need to show a compelling government interest. That's inconsistent with Supreme Court's decision in Knox versus SEIU. Knox involved true public employees, which is necessarily, to a degree, an internal affair for the government. They are public employees. And the court held that collective bargaining, even for true public employees, is subject to exacting First Amendment scrutiny and must be justified by a compelling state interest that is the least restrictive means to satisfying that interest. Except labor peace is a compelling public interest, right? The Supreme Court has held that it is with respect to true employees. And of course, in this case, the plaintiff's position is that interest does not apply to small businesses, such as the licensed childcare providers, or to the grandparents and aunts and uncles who are the non-licensed childcare providers. Because these individuals are not public employees. And in fact, I submit they're not even independent contractors vis-a-vis the state. At most, they're third party recipients of a benefit that is paid to a family. So the CFCAP program, what it does is it gives a benefit to certain families if they fall under a poverty threshold to purchase childcare. It works much like what used to be called food stamps, but it goes to childcare instead of for food. The individual can choose who they purchase their childcare services from. Just like with food stamps, you can choose any grocery store. No one would say that a grocery store that accepts food stamps is a contractor of the government. Yeah, but these providers are licensed, right? Yes, they're subject to licensing, but licensing isn't dependent upon CCAP. You just have to be licensed to run a childcare business. It's not because you accept this. So the state here is not contracting with Jennifer Parrish, for example, to take care of children. She and other providers are just simply willing to accept some customers who happen to pay with a public benefit. And also going to the point of licensing, it's also important to note that some of the providers in this case are not licensed family childcare providers. They're non-licensed. These are relatives taking care of their own children. So for example, it'd be a grandparent taking care of her grandchild in her own home. Those are some of the providers that would be unionized under AFSCME under this statute. You allege that the unlicensed would be covered too, right? Yes, they are covered under the definition of family childcare provider. And I see I have very brief time, so I won't begin anything else unless there's a question from the court. No, thank you on the other side for the arguments. It's been well briefed and well argued. The case is now submitted. We will take it under consideration. Thank you, your honors.